**MID-CENTURY Ltd. Of AMERICA**

v.

**George HOFFERBERT, Collector of Internal Revenue,**

**Eugene Travers, Acting Director of Internal Revenue, and**

**L. Alfred Chamberlin, Director of Internal Revenue.**

Civ. A. No. 8015.

United States District Court
D. Maryland, Civil Division.

Dec. 4, 1956.

John E. Boice, Jr., and South Trimble, 3d, Washington, D. C., and Albert E. Brault, Rockville, Md., for plaintiff.

Charles K. Rice, Asst. Atty. Gen., Andrew D. Sharpe, Fred J. Neuland, and William F. Kolbe, Attorneys, Dept. of Justice, Washington, D. C., and Walter E. Black, Jr., U. S. Atty., Baltimore, Md., for defendants.

THOMSEN, Chief Judge.

This is an action to recover $26,313.88 in income taxes for the taxable period January 1 to May 29, 1951, claimed to have been erroneously assessed and collected. It presents the novel question whether an installment obligation, received as part of the consideration for the sale of an excessively depreciated asset (an apartment house), should be considered an asset having a "substituted basis" within the meaning of sec. 113 (b), I.R.C. of 1939, as amended by the Act of July 14, 1952, chap. 741, 66 Stat. 629, which permits excessive depreciation not resulting in a tax benefit to be restored either to the basis of the asset excessively depreciated or to the basis of an asset having a "substituted basis", as that term is defined and used in sec. 113 (b) (2).

Sec. 113(b) (2), as amended, provides:

"*Substituted basis.* The term 'substituted basis' as used in this subsection means a basis determined under any provision of subsection (a) of this section or under any corresponding provision of a prior income tax law, providing that the basis shall be determined—

684

"(A) by reference to the basis in the hands of a transferor, donor, or grantor, or

"(B) by reference to other property held at any time by the person for whom the basis is to be determined. * * *"

The government contends that since the basis of an installment obligation is determined under sec. 44(d) and not under any provision of sec. 113(a) or any corresponding provision of a prior law, an installment obligation is not an asset having a "substituted basis" as that term is defined and used in sec. 113(b) (2);

and, further, that an installment note is not even analogous to the type of assets referred to in sec. 113(b) (2).

Taxpayer contends that the reference to sec. 113(a) in the first paragraph of sec. 113(b) (2) was intended to be merely a "cross reference" and not an indispensable requirement for a substituted basis under sec. 113(b) (2), and that an installment note is "well within the area of relief envisioned by Congress" in enacting the 1952 amendment.

The statutes in question are set out in note 1 below.[1] All section references

1. "§ 44. Installment basis
"(a) Dealers in personal property. * * * a person who regularly sells or otherwise disposes of personal property on the installment plan may return as income therefrom in any taxable year that proportion of the installment payments actually received in that year which the gross profit realized or to be realized when payment is completed, bears to the total contract price.
"(b) Sales of realty and casual sales of personality [personalty]. In the case (1) * * * or (2) of a sale or other disposition of real property, if in either case the initial payments do not exceed 30 per centum of the selling price * * *, the income may, under regulations prescribed by the Commissioner with the approval of the Secretary, be returned on the basis and in the manner above prescribed in this section. As used in this section the term 'initial payments' means the payments received in cash or property other than evidences of indebtedness of the purchaser during the taxable period in which the sale or other disposition is made.
* * * * *
"(d) Gain or loss, upon disposition of installment obligations. If an installment obligation is satisfied at other than its face value or distributed, transmitted, sold, or otherwise disposed of, gain or loss shall result to the extent of the difference between the basis of the obligation and (1) in the case of satisfaction at other than face value or a sale or exchange—the amount realized, or (2) in case of a distribution, transmission, or disposition otherwise than by sale or exchange—the fair market value of the obligation at the time of such distribution, transmission, or disposition. Any gain or loss so resulting

shall be considered as resulting from the sale or exchange of the property in respect of which the installment obligation was received. The basis of the obligation shall be the excess of the face value of the obligation over an amount equal to the income which would be returnable were the obligation satisfied in full. * * * If an installment obligation is distributed by one corporation to another corporation in the course of a liquidation, and under section 112(b) (6) no gain or loss with respect to the receipt of such obligation is recognized in the case of the recipient corporation, then no gain or loss with respect to the distribution of such obligation shall be recognized in the case of the distributing corporation." 26 U.S.C., 1952 ed., § 44.
"§ 113. Adjusted basis for determining gain or loss—
"(a) Basis (unadjusted) of property. The basis of property shall be the cost of such property; except that—
* * * * *
"(6) Tax-free exchanges generally. [as amended by sec. 213(d), Revenue Act of 1939, supra, and sec. 121(c), Revenue Act of 1943, c. 63, 58 Stat. 21]. If the property was acquired, after February 28, 1913, upon an exchange described in section 112(b) to (e), inclusive, or section 112(l), the basis (except as provided in paragraphs (15), (17), or (18) of this subsection) shall be the same as in the case of the property exchanged, decreased in the amount of any money received by the taxpayer and increased in the amount of gain or decreased in the amount of loss to the taxpayer that was recognized upon such exchange under the law applicable to the year in which the exchange was made. If the property so acquired consisted in part of the type of property permitted by

in this opinion are to the Internal Revenue Code of 1939, as amended.

## Facts

The facts, all of which are stipulated, may be summarized as follows:

section 112(b) or section *112(1)*, to be received without the recognition of gain or loss, and in part of other property, the basis provided in this paragraph shall be allocated between the properties (other than money) received, and for the purpose of the allocation there shall be assigned to such other property an amount equivalent to its fair market value at the date of the exchange. Where as part of the consideration to the taxpayer another party to the exchange assumed a liability of the taxpayer or acquired from the taxpayer property subject to a liability, such assumption or acquisition (in the amount of the liability) shall, for the purposes of this paragraph, be considered as money received by the taxpayer upon the exchange. This paragraph shall not apply to property acquired by a corporation by the issuance of its stock or securities as the consideration in whole or in part for the transfer of the property to it.

"(7) *Tranfers to corporation.* If the property was acquired—

\* \* \* \* \*

"(B) In a taxable year beginning after December 31, 1935, by a corporation in connection with a reorganization, then the basis shall be the same as it would be in the hands of the transferor, increased in the amount of gain or decreased in the amount of loss recognized to the transferor upon such transfer under the law applicable to the year in which the transfer was made. This paragraph shall not apply if the property acquired consists of stock or securities in a corporation a party to the reorganization, unless acquired by the issuance of stock or securities of the transferee as the consideration in whole or in part for the transfer.

\* \* \* \* \*

"(b) *Adjusted basis.* [as amended by the Act of July 14, 1952, c. 741, 66 stat. 629] The adjusted basis for determining the gain or loss from the sale or other disposition of property, whenever acquired, shall be the basis determined under subsection (a), adjusted as hereinafter provided.

"(1) *General rule.* Proper adjustment in respect of the property shall in all cases be made—

Taxpayer, Mid-Century Ltd. of America (Mid-Century) and the Himes Company (Himes) were incorporated on December 15, 1950, as successor corporations and transferees of the assets, li-

\* \* \* \* \*

"(B) in respect of any period since February 28, 1913, for exhaustion, wear and tear, obsolescence, amortization, and depletion, to the extent of the amount—

"(i) allowed as deductions in computing net income under this chapter or prior income tax laws, and

"(ii) resulting (by reason of the deductions so allowed) in a reduction for any taxable year of the taxpayer's taxes under this chapter (other than subchapter E), subchapter E of chapter 2, or prior income, war-profits, or excess-profits tax laws, but not less than the amount allowable under this chapter or prior income tax laws. Clause (ii) of this subparagraph shall not apply in respect of any period since February 28, 1913, and before January 1, 1952, unless an election has been made under subsection (d) \* \* \*.

\* \* \* \* \*

"(2) *Substituted basis.* The term 'substituted basis' as used in this subsection means a basis determined under any provision of subsection (a) of this section or under any corresponding provision of a prior income tax law, providing that the basis shall be determined—

"(A) by reference to the basis in the hands of a transferor, donor, or grantor, or

"(B) by reference to other property held at any time by the person for whom the basis is to be determined.

"Whenever it appears that the basis of property in the hands of the taxpayer is a substituted basis, then the adjustments provided in paragraph (1) of this subsection shall be made after first making in respect of such substituted basis proper adjustments of a similar nature in respect of the period during which the property was held by the transferor, donor, or grantor, or during which the other property was held by the person for whom the basis is to be determined. A similar rule shall be applied in the case of a series of substituted bases.

\* \* \* \* \*

"(d) *Election in Respect of Depreciation, Etc., Allowed Before 1952.* [as added by the Act of July 14, 1952, supra, and as amended by sec. 102, Technical Changes Act of 1953, c. 512, 67 Stat. 615]. Any person may elect to have clause (ii) of subsection (b) (1) (B)

abilities and business of Joseph H. Himes Co., Inc. (the predecessor corporation).

During 1929 the predecessor corporation had acquired a property in Washington, D. C., known as the Park Lane Apartments, at a total cost of $1,250,000. On its books, the predecessor corporation allocated $1,150,000 of the total cost to the building, machinery and equipment account, and the remaining $100,000 to land. From the date of acquisition of the property until December 31, 1937, the predecessor corporation claimed in its income tax returns and was allowed depreciation on the Park Lane Apartments aggregating $363,377.60, attributable to the $1,150,000 costs assigned to depreciable assets. The government made no examination of Mid-Century's tax returns for such years, and did not challenge the accuracy of the deductions. Under sec. 113(b) of the Revenue Act of 1936 and comparable sections of prior income tax laws, the $363,377.60 of depreciation served to reduce the adjusted basis of the Park Lane Apartments for determining gain or loss on the sale or other disposition of the property.

As of December 31, 1937, the government determined that the initial allocation of the cost of the apartment property between land and depreciable improvements, so made by the predecessor

corporation, was erroneous. The government increased the amount of the cost allocated to land by $150,000 and reduced the basis of the depreciable improvements by a corresponding amount. The predecessor corporation consented to this adjustment, and thereafter in each of the taxable years 1938 to 1945 claimed and was allowed depreciation on the reduced cost of the building, machinery and equipment.

During each of the taxable years 1929 to 1937, inclusive, the predecessor corporation had sustained a net operating loss, so that only a portion of the excess depreciation [2] claimed and allowed during those years had resulted in a tax benefit to the predecessor corporation.[3]

On December 31, 1945, the predecessor corporation sold the Park Lane Apartments for $1,100,000, less selling commissions, recording, etc. The gross selling price of $1,100,000 was represented by the following four items: Initial payments, $275,000; Escrow deposits, $71,826.43; Installment obligations, $175,000; Existing first deed of trust assumed by purchaser, $578,173.57. In its income tax return for the year 1945, the predecessor corporation elected to return the gain on the sale of the property on the installment method, as permitted by sec. 44 of the Internal Revenue Code of 1939.[4]

apply in respect of periods since February 28, 1913, and before January 1, 1952. Such an election shall be made in such manner as the Secretary may by regulations prescribe and shall be irrevocable when made, except that an election made on or before December 31, 1952, may be revoked at any time before January 1, 1955. A revocation of an election shall be made in such manner as the Secretary may by regulations prescribe, and no election may be made by any person after he has so revoked an election. The election shall apply in respect of all property held by the person making the election at any time on or before December 31, 1952, and in respect of all periods since February 28, 1913, and before January 1, 1952, during which such person held such property or for which adjustments must be made under subsection (b) (2). An elec-

tion or a revocation of an election by a transferor, donor, or grantor made after the date of the transfer, gift, or grant of property shall not affect the basis of such property in the hands of the transferee, donee, or grantee. No election may be made under this subsection after December 31, 1954." 26 U.S.C., 1952 ed., § 113.

2. i. e. The depreciation attributable to the $150,000 subsequently allocated to land.

3. The losses were so great for the years 1929 to 1935, inclusive, that the predecessor corporation derived no benefit from the excessive depreciation claimed and allowed. By 1936 the losses had diminished to the point that the taxpayer did derive a partial tax benefit from the excessive depreciation for the years 1936 and 1937.

4. In arriving at the amount of gain on

On December 31, 1950, the predecessor corporation transferred to Himes certain of its assets, subject to liabilities applicable to such assets in exchange for all of the authorized capital stock of Himes. On the same date the predecessor corporation transferred to Mid-Century its remaining assets in exchange for all of the authorized capital stock of Mid-Century. Both of these transactions qualified as reorganizations within the meaning of sec. 112(g) (1) of the Internal Revenue Code of 1939, and, pursuant to the provisions of sec. 112(b) (4) of the Internal Revenue Code of 1939, neither corporation was required to recognize any gain or loss as a result of such reorganization. Among the assets so acquired by Mid-Century were $150,000 of installment obligations, representing the unpaid balance of the proceeds of the sale of the Park Lane Apartments made by the predecessor corporation in 1945.[5]

Mid-Century itself was dissolved on May 29, 1951. During the short taxable year January 1 to May 29, 1951, prior to its dissolution, Mid-Century collected the $150,000, less a discount of $3,000. In its income tax return for the period January 1 to May 29, 1951, Mid-Century reported a long-term capital gain of $99,-784.10, which completed the return of the $347,120.16 gain on the sale of the Park Lane Apartments.

On December 30, 1952, pursuant to sec. 113(d), Mid-Century elected to have the provisions of sec. 113(b) (1) (B) (ii), as amended, apply to the method of determining the adjusted bases of their depreciable assets in respect to all taxable periods since February 28, 1913, and before January 1, 1952. It now brings this action on the theory that the tax benefit rule embodied in sec. 113(b) (1) (B) (ii) permits it to increase the basis of the $150,000 installment note and thereby decrease the amount of gain to be returned. As we have seen, the principal question involved is whether Congress, in enacting the 1952 amendments to sec. 113, intended an installment obligation to have a "substituted basis" derived from the property disposed of which would entitle the holder of such an installment obligation to elect the benefits of sec. 113(b) (1) (B) (ii).

The parties have stipulated that if Mid-Century is entitled to the benefits of sec. 113(b) (1) (B) (ii) the amount of refund properly due Mid-Century will be calculated by the parties and submitted to the court prior to the entry of judgment, but that if Mid-Century is not entitled to the benefits of sec. 113(b) (1) (B) (ii), judgment should be entered for Mid-Century in the amount of $751.10, plus interest as provided by law.

### Discussion

Prior to 1932, the internal revenue laws required that for the purpose of determining gain or loss from the sale or other disposition of a piece of property, its basis must be reduced by the amount of depreciation "allowable" in respect of such property for all periods since its acquisition.[6] In 1932, Congress amended the law to provide that such basis must be reduced by the amount of the depreciation "to the extent allowed (but not less than the amount allowable)" for all periods since February 28, 1913.[7]

---

the transaction, an adjusted basis of $727,854.04 was used for the property, of which $250,000 was attributed to land and the remaining $477,854.04 to the building, machinery and equipment. The latter figure reflects the reduction in the basis of the building, machinery and equipment by the excessive depreciation for the years 1929 to 1937, inclusive, from which only a partial tax benefit had been derived.

5. The original $175,000 face amount of installment obligations had been reduced by collections during the years 1946 to 1950, so that on December 31, 1950, the unpaid balance of the installment obligations amounted to $150,000.

6. Sec. 111(b) (2) of the Revenue Act of 1928, 26 U.S.C.A.Int.Rev.Acts, page 376.

7. See sec. 113(b) (1) (B) of the Revenue Act of 1932, 26 U.S.C.A.Int.Rev.Acts, page 518, and report of the Senate Finance Committee, Report No. 1160, 82d Cong., 2d Sess.

Thereafter sec. 113(b) (1) (B) remained virtually unchanged until 1952. However, a conflict developed among the Circuit Courts of Appeal as to whether a taxpayer was required to reduce the basis of property by the amount that the depreciation claimed and allowed for any year exceeded the depreciation properly allowable for such year, in a case where, because of a net operating loss, the excessive depreciation did not serve to reduce the taxpayer's taxes for that year. See Pittsburgh Brewing Co. v. Commissioner, 3 Cir., 107 F.2d 155, and Helvering v. Virginian Hotel Corp. of Lynchburg, 4 Cir., 132 F.2d 909. The Supreme Court granted certiorari in the Virginian Hotel case, and held that excessive amounts claimed by the taxpayer for depreciation in his returns for earlier years were properly deducted from cost in readjusting the depreciation basis of the property in question, although in those years no tax benefit resulted to the taxpayer from the use of depreciation as a deduction. The majority opinion said:

" * * * The purpose of the amendment in 1932 was to make sure that taxpayers who had made excessive deductions in one year could not reduce the depreciation basis by the lesser amount of depreciation which was 'allowable'. If they could, then the government might be barred from collecting additional taxes which would have been payable had the lower rate been used originally. But we find no suggestion that 'allowed', as distinguished from 'allowable', depreciation is confined to those deductions which result in tax benefits. 'Allowed' connotes a grant. Under our federal tax system there is no machinery for formal allowances of deductions from gross income. Deductions stand if the Commissioner takes no steps to challenge them." 319 U.S. 523, 526–527, 63 S.Ct. 1260, 1262, 87 L.Ed. 1561.

In 1952 Congress amended sec. 113 in order to change the rule laid down in the Virginian Hotel case and to provide that where the depreciation taken was in excess of the depreciation allowable, the portion of the excessive depreciation which did not result in a tax benefit may be subsequently restored to the basis of the depreciated property. Under the 1952 amendment, that result is automatic for years beginning after December 31, 1951, and may apply to prior years if a timely election is made under sec. 113(d).

Generally, such adjustments are made to the basis of the asset which has been excessively depreciated, in this case the Park Lane Apartments. And, of course, neither Mid-Century nor its predecessor corporation now owns the Park Lane Apartments. That fact, however, does not automatically foreclose the possibility of such adjustments being made to the basis of some other asset or assets, since Congress decided under certain circumstances to allow such adjustments to be made to the basis of an asset subsequently acquired in exchange for the asset excessively depreciated. To that end, sec. 113(b) (1) (B) (ii), sec. 113 (b) (2) and sec. 113(d), as amended in 1952, provide that adjustments may be made under the tax benefit rule either to the excessively depreciated asset or to an asset for which adjustments must be made under sec. 113(b) (2), that is, an asset having a "substituted basis", as that term is defined and used in sec. 113 (b) (2).

Since Mid-Century acquired the installment obligations in a sec. 112(g) (1) tax-free reorganization, it took them with a "substituted basis" provided by sec. 113(a) (7) (B). The government concedes that if the installment obligations had a "substituted basis" in the hands of Mid-Century's predecessor corporation, we would have a series of permissible "substituted bases", and taxpayer would be entitled to increase the basis of the installment obligations under sec. 113(b) (1) (B) (ii). However, if the installment obligations did not have a "substituted basis" in the hands of Mid-Century's predecessor corporation, taxpayer would not have any such right. The question therefore is whether the

installment obligations in the hands of the predecessor corporation had a "substituted basis" derived from the Park Lane Apartments.

The answer to this question seems quite clear. Sec. 113(b) (2) states plainly that a "substituted basis" is one determined under sec. 113(a), or a corresponding provision of prior law, provided the requirements of either subparagraphs "(A)" or "(B)" are met. The basis of the installment obligations involved in this case was determined under sec. 44(d) and not under any provision of sec. 113(a) or any corresponding provision of a prior income tax law.

Mid-Century's argument that the reference to sec. 113(a) in sec. 113(b) (2) does not limit the application of sec. 113 (b) (2), but only serves as a "cross reference", flies in the face of the clear language of sec. 113(b) (2). So does its argument that subparagraphs (A) and (B) of sec. 113(b) (2) extend the definition of "substituted basis". Those subparagraphs are provisos, limiting the preceding part of the subsection.

Mid-Century contends that, whatever Congress may have said, this case is "well within the area of relief envisioned by Congress" in enacting the 1952 amendment. It may be that Congress did envision relief in such a case as this; but it did not say so. As Lord Mildew said in Bluff v. Father Gray, "If Parliament does not mean what it says, it must say so." A. P. Herbert, Uncommon Law, 192. A more orthodox authority for the same proposition is 62 Cases, More or Less, Each Containing Six Jars of Jam v. United States, 340 U.S. 593, 596, 71 S.Ct. 515, 518, 95 L.Ed. 566, where the Supreme Court said: "After all, Congress expresses its purpose by words. It is for us to ascertain—neither to add nor to subtract, neither to delete nor to distort."

Moreover, I am not convinced that Congress did "envision relief" in such a case as this. The provisions of sec. 44, dealing with installment sales, themselves afford a considerable measure of relief to taxpayers who receive install-

ment obligations. Burnet v. S. & L. Building Corp., 288 U.S. 406, 413, 53 S. Ct. 428, 77 L.Ed. 861. In enacting the 1952 amendment Congress sought to give relief where no other relief was available. Such are the situations literally provided for by sec. 113(b) (2) and 113 (d), read together. Congress evidently thought that where some measure of relief had already been granted, as in the case of installment obligations, it was neither necessary nor desirable to grant additional relief.

I conclude that an installment obligation, received as part of the proceeds of a sale, is not an asset to which Congress intended to allow adjustments under the tax benefit rule; and, that by the clear provisions of sec. 113(b) (2), the installment obligation in this case is not an asset having a "substituted basis" determined by reference to the Park Lane Apartments, as the term "substituted basis" is defined and used in sec. 113(b) (2).

It follows that judgment should be entered in favor of the plaintiff for $751.10, plus interest as provided by law, costs to be paid by the plaintiff.