246 F.2d 435
 MID-CENTURY LTD. OF AMERICA, a Delaware corporation, in dissolution, Appellant,
v.
George HOFFERBERT, Collector of Internal Revenue, Eugene Travers, Acting Director of Internal Revenue, and L. Alfred Chamberlin, Director of Internal Revenue, Appellees.
 No. 7373.
 United States Court of Appeals Fourth Circuit.
 Argued April 4, 1957.
 Decided June 29, 1957.
 
 John E. Boice, Jr., Washington, D. C. (South Trimble, III, Washington, D. C., on brief), for appellant.
 Grant W. Wiprud, Attorney, Department of Justice, Washington, D. C. (Charles K. Rice, Asst. Atty. Gen., Harry Baum, Attorney, Department of Justice, Washington, D. C., and Leon H. A. Pierson, U. S. Atty., Baltimore, Md., on brief), for appellees.
 Before SOPER and SOBELOFF, Circuit Judges, and WILLIAMS, District Judge.
 SOPER, Circuit Judge.
 
 
 1
 Mid-Century Ltd. of America brought this suit to secure a refund of $26,313.88 in income taxes claimed to have been overpaid for the taxable period January 1 to May 29, 1951, when the corporation was dissolved. The tax was imposed upon the gain realized by Mid-Century upon the collection of certain instalment obligations which had been taken by a predecessor corporation in part payment for an apartment house, known as Park Lane Apartments, in Washington, D. C., and had been turned over to the taxpayer in a tax free reorganization. The question involved is whether, in computing the gain from the collection of the instalment obligations, the taxpayer is entitled to have its cost basis modified by restoring the amount of excessive depreciation which the predecessor corporation had taken on the apartment house during the period of its ownership without deriving full tax benefit therefrom. The case calls for an interpretation of certain provisions of the Act of July 14, 1952, Ch. 741, 66 Stat. 629, which amended section 113(b) and added section 113(d) to the Internal Revenue Code of 1939, 26 U.S. C.A. § 113(b, d), and permit the restoration to the cost basis of excessive depreciation which has not resulted in a tax benefit to the owner. The case also involves the application of section 44 of the 1939 Code, 26 U.S.C.A. § 44, which gives the taxpayer an election to return the gain from the sale of property on the instalment method. The District Court rejected the claim and this appeal followed. See 146 F.Supp. 683.
 
 
 2
 As shown by the statement of facts stipulated by the parties and set out in the opinion of the District Court, Joseph H. Himes Company, Inc., the predecessor corporation, acquired the apartment house on March 20, 1929, at the cost of $1,250,000, of which it allocated $1,150,000 on its books to the building, machinery, and equipment and the remaining $100,000 to the land. Thereafter, during the years 1929 to 1937, it claimed and was allowed depreciation in the aggregate sum of $363,377.60 on the depreciable assets. Subsequently it was determined by the Government as of December 31, 1937, that the foregoing allocation was erroneous and that $250,000 of the cost should be allocated to the land and $1,000,000 to the depreciable assets; and thereafter Himes, in each of the years 1938 to 1945, claimed and was allowed depreciation on the reduced cost of the depreciable assets.
 
 
 3
 During the years 1929 to 1937 inclusive, Himes sustained a net operating loss so that only a portion of the excess depreciation claimed and allowed during those years resulted in a tax benefit.
 
 
 4
 On December 31, 1945, Himes sold the apartment house for $1,100,000, less certain expenses, and the transaction resulted in a gain of $347,120.16, taking as a basis the cost subject to the depreciation computed in the two periods as above described. The method by which the gain was calculated is shown by the following tabulation:
 
 
 5
 Selling price:
 Initial payments ..................... $275,000.00
 Escrow deposits ...................... 71,826.43
 Instalment obligations ............... 175,000.00
 First deed of trust .................. 578,173.57 $1,100,000.00
 ___________
 Selling expenses:
 Selling commissions .................. 25,000.00
 Recording and notary fees ............ 25.80 25,025.80
 ___________ _____________
 $1,074,974.20
 Net selling price
 Adjusted basis for determining gain or loss:
 Land ................................. 250,000.00
 Building ............................. 477,854.04 727,854.04
 ___________ _____________
 Gain realized: ........................................... $ 347,120.16
 _____________
 __________
 
 
 6
 Thereafter, Himes made the following collections and reported the following gains:
 
 
 7
 Long-Term
 Capital Gains
 Collections Reported

 1945 $275,000.00 $182,930.00
 1946 76,826.47 51,104.97
 1947 4,999.96 3,325.00
 1948 5,000.00 3,326.00
 1949 5,000.00 3,326.00
 1950 5,000.00 3,326.00
 ____________ ___________
 $371,826.43 $247,337.97
 ____________ ____________
 
 
 8
 In its tax return for the year 1945, Himes elected to return the gain on the sale of the property on the instalment method as permitted by section 44 of the Internal Revenue Code of 1939, 26 U.S. C. § 44.
 
 
 9
 On December 31, 1950, Himes transferred certain assets, including $150,000 of instalment obligations then remaining in its hands, to Mid-Century in exchange for all of the authorized capital stock of Mid-Century. This transaction qualified as a reorganization within the meaning of section 112(g) (1) of the Code of 1939, 26 U.S.C.A. § 112(g) (1), and pursuant to the provisions of section 112(b) (4) of the Code neither corporation was required to recognize any gain or loss as the result thereof.
 
 
 10
 Mid-Century was dissolved on May 29, 1951. During the period between January 1 and May 29, 1951, Mid-Century collected the remaining instalment obligations in the sum of $150,000 less a discount of $3,000; and in its income tax return for the period it reported a long-term capital gain of $99,784.10 which completed the return of the gain of $347,120.16 on the sale of the apartment house. Subsequently Congress passed the Act of July 14, 1952, which was retroactive in its provisions and permitted taxpayers under certain conditions to adjust their cost basis so as to restore excessive depreciation which had been taken but had not resulted in a tax advantage. On December 30, 1952, Mid-Century elected to take advantage of this statute.
 
 
 11
 The contentions of the taxpayer are (1) that the instalment obligations in its hands had a substituted basis within the meaning of sections 113(b) and 113(d) of the Code of 1939 as amended by the Act of July 14, 1952, which permits excessive depreciation not resulting in a tax benefit to be restored either to the basis of the asset excessively depreciated or to the basis of an asset having a "substituted basis" as that term is defined in section 113(b) (2); and (2) that the taxpayer is entitled to the benefits of the Act of July 14, 1952, codified in section 113(d), since Himes, its predecessor in a tax free reorganization, held the apartment house and took excessive depreciation on it without tax benefit; and as Himes would have had the right under the 1952 statute to restore the excessive depreciation to the basis of the apartment house, the taxpayer succeeds to the benefit. The first of these questions was decided against the taxpayer for reasons set forth in the opinion of the District Judge. Since we are in accord with his views on this point they need not be repeated here. His ultimate conclusion was that the basis of the instalment obligations involved in this case was determined under section 44(d) and not under the provision of section 113(a); but the taxpayer's second point, as above set out, does not seem to have been presented to him for his consideration. In our opinion it is well taken.
 
 
 12
 When the apartment house was sold on December 31, 1945, Himes, in compliance with the statutes then existing, computed its profits on the cost basis of the apartment house reduced by the excessive depreciation taken in the years 1929 to 1937; but subsequently the law was changed by the passage of the Act of July 14, 1952, which gave the taxpayer the election, in fixing the basis in respect to any period since February 28, 1913, to make an adjustment for exhaustion, wear and tear taken and allowed in excess of the amount allowable as a deduction in computing net income, if the adjustment taken and allowed had not resulted in a reduction of the taxpayer's taxes for any tax year. See section 113(b) (1) (B) and section 113(d).[1] Under this statute Himes had the right to restore to the cost basis of the apartment house the amount of excessive depreciation theretofore taken and to recompute the profit derived from the sale of the property in any year not barred by the statutes of limitations. This follows because Himes was a person who, within the meaning of section 113(d), had held the property on which the excessive depreciation was taken.
 
 
 13
 We are concerned, however, not with the tax return of Himes showing the gain on the disposition of the apartment house in 1945, but with the return of Mid-Century showing the gain on the collection of the balance of the instalment obligations of $150,000, less a discount of $3,000, in 1951.
 
 
 14
 It is not disputed that Mid-Century stands in the shoes of Himes, because the instalment obligations were acquired by Mid-Century in a tax free reorganization under sections 112(g) (1) and 112(b) (4), and because it is provided by section 113(a) (7) that if the property was acquired after December 31, 1935, by a corporation in connection with a reorganization then the basis shall be the same as it would be in the hands of the transferor. Moreover, the return of gain or loss resulting from the collection or other disposition of instalment obligations is taken care of by section 44 of the Code. Sections 44(a) and 44 (b) provide that, in case of a sale or other disposition of real property, if the initial cost does not exceed 30 per cent of the selling price, the taxpayer may return as income therefrom in any taxable year that proportion of the instalment payments actually received in that year which the gross profit realized or to be realized when payment is completed bears to the total contract price. Section 44(d) specifically provides that if an instalment obligation is satisfied at other than its face value, gain or loss shall result to the extent of the difference between the basis of the obligation and the amount realized, and that any gain or loss so resulting shall be considered as resulting from the sale or exchange of the property in respect to which the instalment obligation was received.[2] The transaction under consideration qualifies under the above-mentioned statutory provisions because the instalment obligations were taken in payment for the apartment house, and as the apartment house was held by Himes since February 28, 1933, a change in the basis of that property would necessarily be reflected in the basis of the instalment obligations. Mid-Century, as successor of Himes, falls within the meaning of section 113(d) as a person who held the excessively depreciated property and is therefore entitled to make the adjustment covered by the Act of July 14, 1952.
 
 
 15
 The only answer of the Government to this contention is that the taxpayer's claim is barred by limitations under the provisions of section 322 of the Code of 1939, 26 U.S.C.A. § 322, since the sale of the apartment house took place on December 31, 1945, and the claim for refund was not filed within three years from the time the return was filed, or within two years from the time the tax was paid.
 
 
 16
 The taxpayer concedes that the years 1945 to 1948 are barred but points out that the claim in suit, which involves the taxable period January 1, to May 29, 1951, is still open under the provisions of section 44 relating to instalment obligations. Section 44(a), as we have seen, directs that the amount of gain from an instalment sale to be returned as income in any taxable year shall be that proportion of the instalment payments actually received in that year which the gross profit realized or to be realized when the payment is completed bears to the total contract price. This means that until the $150,000 of instalment obligations held by the taxpayer were paid in 1951, there was no liability to pay the income tax thereon.
 
 
 17
 This interpretation of section 44 is in accord with the position taken by the Supreme Court in Commissioner of Internal Revenue v. South Texas Lumber Co., 333 U.S. 496, 68 S.Ct. 695, 701, 92 L.Ed. 831, where a taxpayer, in computing its excess profit credit, included in its working capital accumulated profits on certain instalment sales, although it had reported its income from such sales on the instalment basis as authorized by the statute. The Supreme Court held that these profits should not have been included in working capital because they had not been realized and reported during the taxable years. The Court said:
 
 
 18
 * * * "neither §§ 111, 112, nor 113, require a `recognition' of the full face value of installment paper. It is true that § 111(b) does provide that gain or loss `realized' from the sale of property shall be measured by the `sum of any money received plus the fair market value of the property (other than money) received' and § 111(c) provides that the extent of gain or loss shall be `recognized' as determined `under the provisions of section 112.' But § 111(d) provides that nothing in § 111 `shall be construed to prevent (in the case of property sold under contract providing for payment in installments) the taxation of that portion of any installment payment representing gain or profit in the year in which such payment is received.' This means that where a taxpayer has validly reported its income from installment sales on the installment basis provided by § 44, that section, not §§ 111, 112, and 113, prescribes the extent to which receipts from such sales are `recognized' as taxable and the year in which such receipts are `recognized' in computing taxable income. Section 44 provides for the return as income `in any taxable year that proportion of the installment payments actually received in that year which the gross profit realized or to be realized when payment is completed, bears to the total contract price.' Unlike § 111, § 44 does not recognize as subject to income tax liability the `market value' of deferred installment obligations. They may never be recognized by a taxpayer on the installment basis for tax purposes under § 44 or any other section, for they may never be paid, or may be paid only in part. The anticipated profits from these deferred obligations are recognized and taxable under § 44 only if the obligations are paid and when they are paid, unless they are sold or transferred before payment."
 
 
 19
 In view of this decision, it seems clear that the tax on the gain derived from the collection of the instalment obligations in 1951 did not become due until the obligations were paid, and hence the taxpayer properly reported the gain in its income tax return for the taxable period during which it existed. It follows that the statute of limitations did not begin to run until the date of the 1951 return and that the present claim for refund was filed in time.
 
 
 20
 The judgment of the District Court will be reversed and the case remanded for further proceedings in accordance with this opinion.
 
 
 21
 Reversed and remanded.
 
 
 
 Notes:
 
 
 [1]
 Section 113(b) (1) (B)
 "(1) General rule. Proper adjustment in respect of the property shall in all cases be made —
 * * * * *
 "(B) in respect of any period since February 28, 1913, for exhaustion, wear and tear, obsolescence, amortization, and depletion, to the exent of the amount —
 "(i) allowed as deductions in computing net income under this chapter or prior income tax laws, and
 "(ii) resulting (by reason of the deductions so allowed) in a reduction for any taxable year of the taxpayer's taxes under this chapter (other than subchapter E), subchapter E of chapter 2, or prior income, war-profits, or excess-profits tax laws.
 but not less than the amount allowable under this chapter or prior income tax laws. Clause (ii) of this subparagraph shall not apply in respect of any period since February 28, 1913, and before January 1, 1952, unless an election has been made under subsection (d). * * *"
 The language is not free from a certain obscurity, but its meaning is clarified in the Report of the Senate Finance Committee:
 "In the Virginian Hotel case [Virginian Hotel Corp. of Lynchburg v. Helvering, 319 U.S. 523, 63 S.Ct. 126, 87 L.Ed. 1561], the Supreme Court construed the 1932 amendment to mean that, where a taxpayer had claimed excessive amount for depreciation in his returns for earlier years now closed, such excessive amounts were properly deductible from cost in readjusting the depreciation basis of the property in question, even though in those years the taxpayer had received no tax benefit from the depreciation deduction. . . . Thus, the taxpayer would be penalized because of his error in claiming excessive depreciation in an earlier year even though for that year he had a net loss (not capable of being offset against income of a preceding or succeeding year) even without the deduction of the excessive depreciation. Under those conditions the excess depreciation claimed by the taxpayer could have resulted in no tax advantage to him and in no tax prejudice to the Government. Mr. Chief Justice Stone, in his dissent to the Virginian Hotel decision in which he was joined by three members of the Court, termed the above rule an `incongruous' result which was contrary to the statute. This legislation is intended to correct the inequitable tax effects which resulted, or which would in future result, from the application of the rule of the Virginian Hotel decision."
 Section 113(d) "Election in respect of depreciation, etc., allowed before 1952. Any person may elect to have clause (ii) of subsection (b) (1) (B) apply in respect of periods since February 28, 1913, and before January 1, 1952. * * * The election shall apply in respect of all property held by the person making the election at any time on or before December 31, 1952, and in respect of all periods since February 28, 1913, and before January 1, 1952, during which such person held such property or for which adjustments must be made under subsection (b) (2). An election or a revocation of an election by a transferor, donor, or grantor made after the date of the transfer, gift, or grant of property shall not affect the basis of such property in the hands of the transferee, donee, or grantee. * *"
 
 
 [2]
 Section 44(d)"Gain or loss upon disposition of installment obligations. If an installment obligation is satisfied at other than its face value or distributed, transmitted, sold, or otherwise disposed of, gain or loss shall result to the extent of the difference between the basis of the obligation and (1) in the case of satisfaction at other than face value or a sale or exchange — the amount realized, or (2) in case of a distribution, transmission, or disposition otherwise than by sale or exchange — the fair market value of the obligation at the time of such distribution, transmission, or disposition. Any gain or loss so resulting shall be considered as resulting from the sale or exchange of the property in respect of which the installment obligation was received. The basis of the obligation shall be the excess of the face value of the obligation over an amount equal to the income which would be returnable were the obligation satisfied in full. * * * If an installment obligation is distributed by one corporation to another corporation in the course of a liquidation, and under section 112(b) (6) no gain or loss with respect to the receipt of such obligation is recognized in the case of the recipient corporation, then no gain or loss with respect to the distribution of such obligation shall be recognized in the case of the distributing corporation."