Joel J. Tyler, J.
The defendant is charged with three violations of subdivision (a) of section 120 of article 11 of the New York City Traffic Regulations, dated April 1, 1974, promulgated by that city’s Department of Traffic. That section, insofar as it is here applicable, reads:
"§ 120. Unauthorized operation.
"(a) No person shall operate or cause to be operated on any street a bus for the operation of which a franchise, consent, or certificate of convenience and necessity, order, or other authorization of any municipal, state, or federal authority is required, unless such franchise, consent, certificate of conve *873 nience and necessity, order or other authorization shall have been obtained” (emphasis supplied).
A violation thereof constitutes a traffic infraction (Vehicle and Traffic Law, §§ 155, 1800, subd (a); Traffic Regulation, §21).
PACTS
The matter was tried before this court without a jury.[1] The testimony of two inspectors of the Bureau of Franchises was to the effect that they are charged to check into any illegal bus operations; that one of the inspectors had noticed an ad in a local newspaper offering transportation to Manhattan for $2 per trip from "your door to your destination,” which was 25 cents cheaper than the charge made by others; that their suspicion thus aroused, they checked further; that on December 11, 16 and 17 they observed the defendant pick up passengers at several locations within the Co-op City housing development in The Bronx and transport them to Manhattan; that on one such occasion the inspectors followed defendant’s vehicle into Manhattan; that defendant never received a franchise from the Board of Estimate, although required to have one; and that the vehicle used by defendant was a 12-passenger airport limousine.
The defendant substantially confirmed the inspectors’ testimony and added that he operates a "limousine service” by responding to telephone calls from customers in the Co-op City development and transports them to specified areas in Manhattan near their places of employment, and, if desired, back to their homes in Co-op City at day’s end; that the charge was $2 per person per one-way trip, or $15 per week, round trip for five weekdays; that he does not randomly pick up passengers in the street or at bus stops; that he did not and does not now hold a duly issued franchise from the Board of Estimate. The defendant maintains that he does not operate a "bus” as defined by law, but rather operates as an "unscheduled contract carrier” of persons for hire, over which the State Department of Transportation has exclusive jurisdiction.
THE ISSUES
(1) Is defendant required to secure a franchise from New *874 York City’s Board of Estimate as a prerequisite to such operation?
(2) Does the defendant’s transportation operation constitute a "bus” operation within the purview of subdivision (a) of section 120 of the Traffic Regulations?
DECISION
Firstly, the court should comment upon the fact that the defendant appeared without the benefit of counsel. His right to do so is one of constitutional dimension and may not be easily ignored. The United States Supreme Court has recently mandated that the election of self-representation must be respected so long as it is made voluntarily and intelligently. (Faretta v California, 422 US 806). The court is satisfied, as a result of its inquiry, that the defendant did, in fact, voluntarily and intelligently elect to proceed without counsel. It should be further noted that in the hearings before the New York State Department of Transportation, held February 11 and 14, 1975, relative to defendant’s application for a permit to operate as an auto contract carrier of passengers, he also appeared without counsel.
In permitting such self-representation, this court also considered the fact that the issues involved were relatively uncomplicated and well articulated and explicated by defendant.
Parenthetically, the prosecution of this relatively minor offense (a traffic infraction) carries with it no statutory or constitutional right to assignment of counsel, although a conviction could conceivably lead to imprisonment (People v Farinaro, 36 NY2d 283, 285).
Subdivision (a) of section 120 of the Traffic Regulations, under which defendant was prosecuted, prohibits the use of our streets by any "bus” requiring a franchise. The defendant claims that his business activity cannot be construed as a bus operation, but rather a contract carrier activity, over which the State Department of Transportation has exclusive jurisdiction, and his failure to secure the necessary permit from that State department would subject him to prosecution by the State, only.
On December 13, 1974, the defendant applied to the State Department of Transportation for a permit to operate as a contract carrier of passengers by motor vehicle, under the *875 authority of section 203 of the Transportation Law. Public hearings were held relative to that application and the defendant and a number of witnesses appeared and testified in his behalf. Those hearings resulted in a denial of defendant’s application, as indicated by the department’s findings and order of April 15, 1975, admitted in evidence. It should be noted that the findings concluded, in part, with the determination that defendant’s operation failed to indicate "that the proposed service would be a contract carrier service.”
The defendant did not seek redress in the Supreme Court under an article 78 proceeding. This court, of course, has no jurisdiction to review that administrative determination. It may not usurp the exclusive jurisdiction of the Supreme Court. We are, therefore, constrained to respect and give legal credence to that determination until overturned by the appropriate court (CPLR 7801, 7803-7804). In any event, no court should, "under the guise of exerting judicial power, usurp merely administrative functions by setting aside a lawful administrative order upon [their] conception as to whether the administrative power has been wisely exercised” (Interstate Commerce Comm. v Illinois Cent. R. R., 215 US 452, 470; Matter of Recreation Lines v Public Serv. Comm., 7 AD2d 20, 22-23). Accordingly, we are bound to maintain that the defendant’s operation is not that of a "[c]ontract carrier of passengers by motor vehicle,” as defined by subdivision 22 of section 2 of the Transportation Law.
That definition includes within its meaning the transportation of passengers by motor vehicle for compensation, but excludes the "operation of a bus line.” Although the State Transportation Department found that defendant’s operation was not in the nature of a contract carrier, it did not affirmatively find it to constitute a bus or bus line.
We now address ourselves to the question whether the Board of Estimate, through its Bureau of Franchises, has jurisdiction over the defendant’s operations. If so, the defendant is required to secure a franchise. Admittedly he has not applied for nor does he hold such license.
The defendant maintains that his operation is, in fact, in the nature of a contract carrier, in spite of the aforesaid administrative ruling, and that he does not operate a bus or bus line within the meaning of the law. And he further seems to say that if he is not a contract carrier nor a bus or bus line, *876 then there is no mandate for the regulation of his transportation business. „
Merely to suggest that his argument is illogical on its face, cannot convince this lay defendant, standing alone before this court, that the decision of the court has greater logic. He deserves a legal and reasonable explanation and so do others who presently engage in or propose to engage in a business similar to that of defendant without first securing a franchise.
A reasoned and careful explanation is indicated for an additional reason. The defendant has vociferously, distressingly, and conscientiously insisted, both orally and in writing, that he has been put upon by the Bureau of Franchises and its inspectors. Although I find no impropriety on the part of city officials, nevertheless, I deem it advisable that the defendant, by this somewhat elaborate opinion, understand that the court has considered his position carefully, with the view that the apparent objectivity of local authority, in this instance, be recognized by him and his confidence restored. This court can find no precedent in answer to the issue raised by defendant, and, therefore, clarification by written opinion is further indicated.
At common law those transporting passengers for hire were not required to be licensed or otherwise supervised, since the galloping hoof and wagon wheel over the few distinct dirt roads presented no major inconvenience to the public welfare nor exposed it to serious danger (Barbour v Walker, 126 Okla 227, 229).
However, with the advent and then proliferation of the automobile and extensive network of paved highways and byways, there congealed a progressively marked awareness of the dangerous potential the motor vehicle presented; accordingly, it was seen to require strict regulation. Such regulation comports with State police powers (Bus Depot Holding Corp. v Valentine, 288 NY 115, 123; Arrow Carrier Corp. v Traffic Comm. of City of N. Y., 198 Misc 1112, 1115; Matter of Teuch v Murphy, 45 Misc 2d 81, 83; 60 CJS, Motor Vehicles, § 45, subd [2]). Those vehicles, transporting passengers for hire, were affected with a special public interest, since fraud and overcharging as well as unsafe mechanical conditions were probable without regulation. Therefore, the regulation of motor vehicles transporting passengers, including bus lines, became necessary to "promote safe, adequate, economical and efficient service * * * and reasonable charges therefor without unfair *877 or destructive competitive practices”. This is the declared public policy of the State and city (Transportation Law, § 200; New York City Charter, ch 65, § 2301).
Prior to 1970, "bus line” operations, either inter- or intracity, were regulated by the State Department of Transportation. However, in 1970 (L 1970, ch 267, § 3) the regulation of bus lines, relative to "the rates of fare, route destination or certification of public convenience and necessity, or service” were transferred to all cities with populations over one million, namely, New York City. And "The governing body of any such city or any agency of such city to be designated by it shall have and exercise the powers and duties which except for the provisions of this section would be had and exercised by the commissioner [of Transportation] with respect to service rendered on bus lines within such city” (Transportation Law, § 80, subd 6). A similar provision appears in section 5-d of the Public Service Law relative to "omnibus line operations,” which transferred that authority to such cities in 1962 CL 1962, ch 162).
The "powers and duties” of these State agencies, so transferred, included the licensing of such bus and omnibus operations under such conditions as may be advisable or necessary in the public interest, the regulation of rates and charges to assure that they are "just and reasonable,” and regulation to assure safe and adequate equipment (Transportation Law, §§ 141-142, 149; Public Service Law, §§ 60-a, 61).[2]
That transfer of authority was further formalized in section 362 of chapter 14 of the New York City Charter which provides that "The board of estimate shall have the control of the streets of the city * * * and shall have the exclusive power in behalf of the city to grant franchises or rights or make contracts providing for or involving the occupation or use of any of the streets of the city * * * for the transportation of persons.” Further, a franchise must be obtained from the Board of Estimate for the use of any omnibus route or routes for public use operating upon any city street (Administrative Code of City of New York, ch 14, § 362-1.0). Accordingly, the City of New York, through its Board of Estimate, now has exclusive jurisdiction over the regulation of bus and omnibus lines "within such city.”
*878 To assist in the issuance and supervision of such franchises,. the Board of Estimate has mandated the Bureau of Franchises,[3] to investigate, negotiate, prepare agreements, make recommendations and reports to the Board of Estimate for its consent to the grant of any franchise or right of any kind or nature whatsoever for or relating to the occupation and use of the streets of the city.[4]
Accordingly, it is clear that any person engaged in a "bus line” or "omnibus line” operation on the streets of the City of New York and exclusively within its confines must apply for and secure a franchise from the Board of Estimate, through its Bureau of Franchises, as a prerequisite to such operation.
Is the defendant’s business in the nature of a "bus line” or "omnibus line” operation?
In the determination of the meaning of these terms, the court is reminded of certain basic rules of statutory construction.
The regulation here involved (Traffic Regulation, § 120 [a])[5] is penal in nature, in that, as a traffic infraction, its violation may cause the imposition of a fine or imprisonment, or both (Vehicle and Traffic Law, §§ 155, 1800; Penal Law, § 10.00, subd 2). Usually, such statutes must be strictly construed against the State and in favor of the defendant. Their words may not be given a tortuous or strained meaning, nor may they be extended to doubtful situations (McKinney’s Cons. Laws of N. Y., Book 1, Statutes, § 271). Nevertheless, in construing such statutes, a court is not straight-jacketed so as to foreclose the application of the historic doctrine that the intent of the framers is the primary object. Statutory interpretation may not be so strictly construed as to pervert such legislative intent. (Statutes, § 2 subds a, b; §§ 111, 230, 272; Verona Cent. Cheese Co. v Murtaugh, 50 NY 314, 317; People *879 v Dennis, 206 Misc 402, 403.)[6] "Whatever is within the spirit, although not within the letter, is within the statute and what is within the letter and not within the spirit is not within the statute” (Standard Acc. Ins. Co. v Newman, 2 Misc 2d 348, 359, affd 268 App Div 967, app den 268 App Div 1039; Walden v City of Jamestown, 178 NY 213, 216).
But equally important is the understanding of long vintage that penal statutes remedial in nature, in that the penalty prescribed is for the good and benefit of the public, will not be given strict but rather relaxed and equitable construction. They will not be so construed as to advance a private interest at the expense of the public good (Statutes, §§ 275, 341; People v New York Cent. R. R. Co., 25 Barb 199, 202, affd 13 NY 78; Matter of Machcinski [Ford Motor Co. — Corsi], 277 App Div 634, 644; Matter of Mittleman [Corsi], 282 App Div 587, 589 Matter of Anderlohr v City of New York 201 Misc 605, 607).
Accordingly, a statute requiring the licensing and regulation of buses "should be so construed that the public may have the benefit of its full enforcement wherever its interests are threatened” (Public Serv. Comm. v Booth, 170 App Div 590, 592). And a statute to protect the public from the menace of automobiles, operated without proper supervision, should not receive a strict construction (People v Rue, 166 Misc 845, 848; People v Pinnock, 207 Misc 1097,1099).
Accordingly, all statutes and regulations requiring the licensing or franchise and supervision of motor vehicles transporting passengers, with or without compensation, and providing penal restraint for their violation, are remedial in nature and should be liberally and equitably construed to advance and protect the public good as against the private interest. This court is guided by that reasonable criterion.
THE TERMS "BUS,” "BUS UNE,” "OMNIBUS” AND "OMNIBUS line” have the same meaning
The term "bus line” is defined in subdivision 12 of section 2 of Transportation Law as "a motor vehicle * * * operated for the use and convenience of the public, usually along the same route or between stated termini, or on a fixed or stated schedule, carrying passengers for hire”.
Certainly defendant’s operation was for the use of the *880 public, willing to pay his charge. His stated termini are from Co-op City to the specified stops in Manhattan, and return. This was found by the Transportation Department during the aforementioned hearing and is found by this court as a fact. Accordingly, the defendant’s operations are deemed a "bus line” as defined under that statute.
Further, the term "omnibus line” in subdivision 28 of section 2 of the Public Service Law, prior to 1970, was defined almost precisely as a "bus line” is now defined in the Transportation Law. In 1970 (L 1970, ch 267, § 5) the definition of "omnibus line” was repealed as it appeared in the Public Service Law and the definition of "bus line,” above, was enacted into the Transportation Law, without substantive change in language or meaning from that of "omnibus line.” There is now no separate definition of the term "omnibus line” in the Transportation Law.
It would, therefore, appear that the Legislature intended the same meaning for "bus line” which it had given to "omnibus line” prior to 1970. The terms "bus line” and "omnibus line” are deemed to have the same meaning insofar as these statutes are concerned.[7]
’’Bus” is not defined in the Traffic Regulations. They adopt those definitions of words and phrases in the Vehicle and Traffic Law not defined in the regulations (Traffic Regulations, § 1(a)).
The term "bus” prior to April 1, 1973, was defined in section 104 of the Vehicle and Traffic Law as either a "motor vehicle designed for carrying more than ten passengers” or a "motor vehicle, other than a taxicab, designed and used for the transportation of persons for compensation.”
The second classification of motor vehicle in that definition was essentially the same as the definition for "omnibus,” appearing at section 126 of that law as "any motor vehicle used in the business of transporting passengers for hire”.
To obviate such redundancy, said section 104 was amended, *881 in 1972, effective April 1, 1973 (L 1972, ch 780, § 1), to omit from the term "bus” any motor vehicle designed and used for transporting persons for compensation, which already had been and is included under the definition of "omnibus.” We now have in the Vehicle and Traffic Law a separate definition for "bus” (§ 104) and another for "omnibus” (§ 126). The definition of "bus” under section 104 now reads: "Every motor vehicle having a seating capacity of more than fifteen adults in addition to the driver and used for the transportation of persons.”
These separate definitions would appear to represent artificial, administrative distinctions. Even when referred to in the Vehicle and Traffic Law the term "bus” and "omnibus” are used interchangeably (Vehicle and Traffic Law, § 370, relative to insurance required for specified vehicles; §§401, subd 7, 501, subd 2, relative to classification of licenses). It is apparent that prior to the 1972 amendment the terms "bus” and "omnibus” were both legislatively intended to refer to any vehicle, irrespective of its passenger capacity, transporting persons for hire (1919 Opns Atty Gen 219, 20 NY St. Dept. Rep. 258; 1925, 35 NY St. Dept. 175). This amendment should not be construed to restrict or limit the authority of New York City over vehicles having a passenger capacity of less than 15 passengers, if such vehicles transport passengers for hire within that city, nor does it diminish its authority over "bus lines,” which was effectively transferred to it by subdivision 6 of section 80 of the Transportation Law. It is evident that the Legislature, in passing such amendment, never intended such restriction or limitation.[8]
Prior to that 1972 amendment, section 120(a) of the Traffic Regulations read precisely as it does today, in that it prohibits the use of any "bus” requiring a franchise to use any city street. With the 1972 amendment of section 104 of the Vehicle and Traffic Law, section 120(a) of the Traffic Regulations was not changed to expressly include "omnibus” within the meaning of "bus,” so as to avoid any possible question of its *882 inclusion within that latter term. (See Traffic Regulations, dated Dec. 1, 1972 and April 1,1974.)
And so defendant, discerning a possible defense, maintains that he did not operate a “bus,” in that his vehicle has a capacity of only 12 adults and not "more than fifteen adults” as “bus” is now identified in section 104 of the Vehicle and Traffic Law. Since the prohibition in section 120(a) of the Traffic Regulations against the use of city streets without a franchise relates only to a “bus,” then it must be said, claims defendant, that (1) he does not require a franchise and, accordingly, (2) he may not be prohibited or penalized when driving upon New York City streets with passengers.
That defense is unsupportable. It must be emphasized, as already noted, that the operation of motor vehicles, in general, and those transporting passengers for hire, in particular, are affected with a keen public interest. For that reason operators of taxicabs, coaches and limousines are required to secure a license and are carefully regulated in New York City.[9] Railroads, common carriers, streetcars, buses and bus lines, contract carriers of property and passengers are licensed and regulated by State authority under the Transportation Law, except where it has assigned that authority to municipalities.
Whether by State, municipal or Federal authority, it is the intent of government to license and regulate the operation of any motor vehicle upon the public highways and streets.[10] With respect to the operation of motor vehicles engaged in the *883 transportation of public passengers for hire, this State and city government has the further authority to regulate rates, fares and charges of such transportation business (Transportation Law, §80, subd §6; §§119, 171, 202; New York City Charter, ch 14, §§ 362, 369; Klein v O’Dwyer, 192 Misc 421, 423; 60 CJS, Motor Vehicles, § 54, subd [1]).
To suggest that the city may require special licensing and can regulate motor vehicles carrying passengers for hire which are designed for five such passengers (taxicabs), or designed to carry a maximum of seven (coach), or a maximum of eight (limousine),[11] or buses with a capacity of more than 15 passengers (Vehicle and Traffic Law, § 104), but may not require and may not regulate such motor vehicle having a maximum capacity of 12 persons, as defendant would maintain, creates an aberrant result, discordant with expressed public policy and historic necessity.
In the light of the stated public policy (Transportation Law, § 200; New York City Charter, ch 65, § 2301), and in giving effect to the afore-mentioned criteria of statutory construction, it is clear that the term "bus,” as used and intended in subdivision (a) of section 120 of the Traffic Regulations, is of generic dimension. It encompasses within its meaning any motor vehicle used in the business of transporting passengers for hire upon the highways and streets of New York City, without regard to the seating capacity of such vehicle.
Accordingly, the term "bus” as used in section 120(a) of the Traffic Regulations is reasonably construed to include and be interchangeable with the term "omnibus,” as defined in section 126 of the Vehicle and Traffic Law, which latter term includes all motor vehicles used in the business of transporting passengers for hire.
The sagacious observation of Mr. Justice Holmes has relevance here. He noted that a "word is not a crystal, transparent and unchanged, it is the skin of a living thought” and takes its "color and content according to the circumstances * * * in which it is used.” (Towne v Eisner, 245 US 418, 425.)
The defendant was required, prior to the commencement of his transportation operations, to secure a franchise from the Board of Estimate through its Bureau of Franchises. He failed to do so. He was properly charged with the violation of section 120(a) of the Traffic Regulations and he is found guilty with *884 respect to each separate violation. He shall be fined under the authority of subdivision (b) of section 1800 of the Vehicle and Traffic Law.

. Defendant is not entitled to a jury trial for a traffic infraction (CPL 340.40).

. Sections 60-a and 61 of the Public Service Law were repealed by the Laws of 1970 (ch 267, § 5) and substance thereof transferred to the Transportation Law, which now relates to all State transportation operations.

. The Bureau of Franchises was created by subdivision 2 of section 68 of the New York City Charter to operate under the Board of Estimate and to perform such duties as may be delegated to it by that board.

. For a view of the procedure in securing a franchise, see Board of Estimate calendar for April 24, 1975, item No. 205 and calendar for September 11, 1975, item No. 207 relative to petition for a franchise covering a rickshaw transportation operation in Chinatown.

. Sections 1642,1603, and 1604 of the Vehicle and Traffic Law authorize New York City to promulgate such regulation, and chapter 63-A (§ 2103, subd 1) of the New York City Charter, empowers the Transportation Administrator of that city "to make such rules and regulations for the conduct of vehicular * * * traffic in the city * * * as may be necessary”.

. An indication how far we have gone from an unqualified strict construction of penal statutes, see section 5.00 of the Penal Law.

. "Bus” is defined as "a large motor coach that can carry passengers, generally following a regular route; omnibus.” (Webster’s New World Dictionary). “Omnibus” is defined as "a vehicle, commonly a large four wheeled carriage * * * for conveying passengers short distances; abbreviated to ‘bus’.” (Webster’s Universal Unabridged Dictionary). "Bus. A contraction of the word 'omnibus’ and well understood to be a vehicle which serves the passenger public but which does not operate upon fixed tracks.” (60 C.J.S., Motor Vehicles, § 5.) Historically, these two terms have a common meaning and are used in the alternative in everyday language..

. Unless there is clear evidence that the legislative design is to modify substantively an earlier piece of legislation, full effect must be given to both the earlier and later statutes, if possible. (General Construction Law, § 95; People v Heath, 77 Misc 2d 215, 218.) I find nothing in the amendment of section 104 of the Vehicle and Traffic Law which would indicate a legislative intent to foreclose or limit the use of the term "bus” and "omnibus” interchangeably, as it relates to those vehicles transporting passengers for hire.

. Chapter 65 of the New York City Charter creates the New York City Taxi and Limousine Commission. Section 2302 of chapter 65 of the Administrative Code defines "taxicabs” as a motor vehicle carrying passengers for hire and designed to carry no more than five passengers; a "coach” is similarly defined but designed to carry no more than seven passengers, and a "limousine,” also similarly defined, but designed to carry a maximum of eight passengers. These types of vehicles require a special license and are otherwise subject to regulation under'that law.

. See chapter 63-A of the New York City Charter establishing a Transportation Administration in New York City. Subdivision 1 of section 2103 thereof provides: "With respect to traffic the administrator shall have the following functions: (a) to make such rules and regulations for the conduct of vehicular * * * traffic in the city, and in the streets, squares, avenues, highways and parkways in the city as may be necessary”. (See, also, Transportation Law, § 14.)
"The use of the public streets for hire has never been considered a right but has always been treated as a privilege granted by the city. As a privilege affected with a public interest, it is subject to all reasonable regulation. (Packard v Banton, 264 US 140, 143, 145)”. (Matter of Rudack v Valentine, 163 Misc 326, 330, affd 274 NY 615; also Valentine v Chrestensen, 316 US 52, 54, which affirms that the gainful occupation of the streets are matters for legislative judgment.

. See n. 9, supra.