M. Marvin Berger, J.
In 1725 the Italian philosopher, Giambattista Vico, wrote: "Men of limited ideas take for law what the words expressly say. Intelligent men take for law whatever impartial utility dictates in each case.” (The New Science, Book I, Axioms 319, 323.)
Vico’s pragmatism had been preshadowed by earlier pronouncements; for example, St. Paul, who, in Second Corinthi *1030 ans III 6, said: "Not of the letter, but of the spirit, for the letter killeth, but the spirit giveth life.”
And Rabbi Johannon, one of the sages of the Babylonian Talmud, wrote: "Jerusalem was destroyed because her inhabitants interpreted the law according to the letter and not according to the spirit.” (Baba Metzia [The Middle Gate] fol. 30 b.)
Guided by these pronouncements, this court must rule whether the letter of the law or its intent should govern its interpretation of subdivision g of section 436-5.0 of the Administrative Code of the City of New York, making it unlawful for a person to sell, use, or possess "any toy or imitation pistol or revolver which substantially duplicates an actual pistol or revolver.”
The device involved in the instant case is an actual revolver, lacking an essential part, the firing pin.
The defendant was originally charged with possessing a weapon, in violation of section 265.01 of the Penal Law. During the course of a preliminary hearing, the prosecution admitted that the pistol was inoperable. Since the device was incapable of firing a bullet, it was not a firearm (People v Grillo, 15 AD2d 502, affd without opn 11 NY2d 841), and the charge under section 265.01 of the Penal Law would have had to be dismissed.
The People then moved to add a charge of violation of the above-quoted section of the Administrative Code. The code excepts from its scope an imitation or toy pistol and revolver colored other than black, blue, silver or aluminum, provided the barrel is closed with the same material as the body of the instrument for a distance of not less than one-half inch from the front end of the barrel.
As heretofore stated, the device is not a firearm since it was incapable of being fired (People v Grillo, supra; People v Johnson, 42 Misc 2d 164; People v Rivers, 76 Misc 2d 972). Unless it can be shown that the defect in the pistol was readily correctible so that it could be made operable with a reasonable amount of effort, and that the defendant was capable of performing such a repair, the defendant cannot be held to answer to a charge of possession of a weapon (People v Haskins, 190 Misc 888, 889).
Thus we are left only with the question of whether defend *1031 ant can be held for trial on the charge of possessing a toy or imitation pistol in violation of the Administrative Code.
The term "imitation” pistol is used not only in the Administrative Code but in the Penal Law, which interdicts possession of an imitation pistol "with intent to use the same unlawfully against another” (Penal Law, § 265.01, subd [2]).
In a comprehensive opinion in People v Webb (78 Misc 2d 253), my esteemed former colleague, Judge Daniel Hoffman, analyzed both the Penal Law and Administrative Code provisions. He held that "the Penal Law contemplates an imitation pistol in the reality of its use, while the Administrative Code contemplates an imitation pistol in the reality of its appearance” (p 254).
In Matter of Don R.B. (66 Misc 2d 279), the late Family Court Judge Jacob T. Zukerman construed former subdivision 9 of section 265.05 of the Penal Law to mean that the appearance of the instrument, as well as the intent to use it as a weapon, is important. He quotes (p 281) with approval from People v Del Gardo 1 Misc 2d 821, 827): "the word imitation when applied to pistols and revolvers means so nearly resembling the genuine as to mislead with the apparent object of producing, and likely to produce upon the minds of those against whom it is to be used, the belief that the imitation weapon is capable of producing all the injurious consequences to the victim as the use of the genuine article itself.”
In People v Klufus (1 Misc 2d 828, 830, affd 2 AD2d 958), Criminal Court Judge Bayer wrote: "In considering the imitation pistol, we are no longer playing with the innocent little toy of our boyhood. We are now confronted with an object similar in all respects to a pistol or automatic which, when pointed at the breasts of men, is used daily in the commission of bank robberies, holdups and other atrocious crimes.”
The Administrative Code provision in its original form stated that a new section, to be designated section 436-50, subdivision g, was to be added to the Administrative Code. The new section was to be headed "Sale of toy pistols copied from actual weapons.” The proposed amendment was referred to the Committee on General Welfare on December 21, 1954. The committee reported on the measure with the following comment: "The bill has for its purpose the prevention of the manufacture, sale, possession and use of toy pistols which are so closely imitative of real ones as to be used or usable for *1032 nefarious purposes. The Committee agreeing with the purpose thereof recommends adoption as amended.” (Proceedings of the Council of the City of New York, vol 1, p 74, Jan. 1955-June 1955.)
However, in a later report of the Committee on General Welfare accompanying the final version of the bill which was enacted into law on March 8, 1955, the committee stated in part: "The purpose of the bill is to prevent the sale, possession or use of models so closely copied from actual weapons as not to be readily discernible as toys.”
The defense relies heavily on the opinion in People v Rivers (76 Misc 2d 972). In that case, my learned colleague Criminal Court Judge George F. Roberts said (p 975) he could not hold "that it was the Legislature’s intent to include real weapons, though inoperable, as imitation weapons.” He felt that the language of the committee reports "clearly shows that the Legislature was concerned solely with prohibiting a model of a weapon and not the actual weapon itself. A real revolver, even if inoperable, is not a model. One should not play a game of semantics with the statute by pretending that a concededly inoperable real revolver is a copy of a real revolver. Certainly, one would not call a broken radio a copy of a real radio or a defective toaster a copy of a real toaster” (p 975).
Concededly a broken toaster is not a copy of a real toaster. But neither is it the object of a legislative attempt to prevent possession of a Simulated lethal instrument.
This court disagrees with the holding of my learned colleague, Judge Roberts, that "the language of the committee report * * * was concerned solely with prohibiting a model of a weapon and not the actual weapon itself’ (supra, p 975).
On the contrary, I believe that the intent of the council was to restrict possession of pistols so closely resembling actual weapons as not to be readily discernible as toys, thus making them "usable for nefarious purposes,” and that the loose use of words such as "models” in a legislative report is not inconsistent with that intent.
My learned colleague admits that his holding leads to an incongruous situation: the possession of a model pistol or revolver is illegal, while possession of an authentic but inoperable weapon is legal.
Conceivably, the incongruity may suggest that Judge Roberts’ reading of the legislative intent is erroneous. For, as has *1033 been stated by our Court of Appeals: "When the courts make an exception from the letter of a statute * * * they do so to avoid a result so unreasonable or absurd as to force the conviction upon the mind that the excepted subject could not have been intended by the Legislature, and that if it had been presented to that body, it would have disclaimed any intention to include it.” (Morgan v Hedstrom, 164 NY 224, 230.)
The court in Rivers said that even if it could not have ascertained the legislative intent in enacting section 436-5.0 of the Administrative Code, it would have come to the same conclusion based on the Webster Third New International Dictionary definition of "imitation” as something "made or produced as a copy: an artificial likeness.” (Supra, p 975; emphasis added.)
But the Webster definition does not support the conclusions reached by Judge Roberts. The Webster definition refers in part to something made or produced as a copy.
Assume, arguendo, that a pistol manufacturer produces a pistol but purposely omits a trigger or the essential operating mechanism and sells the product. Clearly, the incomplete pistol, as an imitation, would violate the Administrative Code. But assume that the manufacturer, finding a ready market for incomplete weapons, takes a quantity of operable pistols and removes the same actuating mechanism as those omitted from the guns "made or produced” as imitations and labels the guns "imitations.” Does the removal of the operating mechanism make the pistol less of an imitation than the failure to insert it in the first place?
Concededly the city council might have used more exact language in its efforts to interdict the possession of an instrument which "substantially duplicates” a "real pistol or revolver” but falls short of the genuine article.
But here we encounter the elusive pursuit of that will-o’the-wisp — the quest for precision. In his entertaining study of legal terminology, The Language of the Law, David Mellinkoff wrote: "It would be a most strange and wonderful thing if lawyers had indeed been able to succeed where the rest of talking and writing humanity had failed. The quest for a precise language is as ancient as the search for the fountain of youth and less capable of fulfillment than the alchemist’s dream of turning lead into gold.”
Would the use in the Administrative Code provision of other *1034 words such as "copy,” "duplicate,” "reproduction,” "facsimile,” or "replica” have been more precise than "imitation”?
So we are again required to look to what the city council intended. In my view the intent of the council seems apparent —prohibition of the possession of something that so closely resembled an actual, operable weapon as to permit its use for illegal purposes, however that something is designated.
In carrying out that intent, we should be mindful of Coke’s maxim: "Verba intentione non e contra debent inservare.” (8 Coke 94.) (Words ought to be made subservient to the intent, not the intent to the words.)
In the recent case of People v Schuster (83 Misc 2d 871, 878-879) my learned colleague, Judge Joel J. Tyler, restated the well-recognized rule of statutory construction of penal statutes.
"Usually, such statutes must be strictly construed against the State and in favor of the defendant. Their words may not be given a tortuous or strained meaning, nor may they be extended to doubtful situations (McKinney’s Cons. Laws of N.Y., Book I, Statutes, § 271). Nevertheless, in construing such statutes, a court is not strait-jacketed so as to foreclose the application of the historic doctrine that the intent of the framers is the primary object. Statutory interpretation may not be so strictly construed as to pervert said legislative intent (Statutes, § 2, subds a, b; §§ 111, 230, 272; Verona Cent. Cheese Co. v Murtaugh, 50 NY 314, 317; People v Dennis, 206 Misc 402, 403.) 'Whatever is within the spirit, although not within the letter, is within the statute and what is within the letter and not within the spirit is not within the statute.’ (Standard Acc. Ins. Co. v Newman, 2 Misc 2d 348, 359, affd 268 App Div 967, app den 268 App Div 1039; Walden v City of Jamestown, 178 NY 213, 216).”
Section III of book 1 (Statutes) of McKinney’s Consolidated Laws of New York states the rule: "The courts may in a proper case indulge in a departure from literal construction and will sustain the legislative intention although it is contrary to the literal letter of the statute.”
Although the question of whether a real but inoperable gun can be termed an imitation does not appear to have been answered in this jurisdiction, there are some indications from other sources that the appearance rather than the reality of the instrument, the purpose for which it is usable, and its *1035 effect on the person to whom it is displayed are of importance in deciding whether the law has been violated.
Sections 140.30 and 160.15 of the Penal Law, defining burglary and robbery in the first degree, define as an element of the crime the display of "what appears to be a pistol, revolver, rifle, shotgun, machine gun or other firearm” in the course of committing the crime. (Emphasis supplied.) The fact that the weapon was unloaded and thus incapable of producing death or other serious injury is an affirmative defense. As noted in the Practice Commentary to section 160.15 by Arnold Hechtman (McKinney’s Cons Laws of NY, Book 39, Penal Law, § 160.15, p 206): "the provision affords the defendant an opportunity to fight his way out of a first degree conviction if he can prove that the gun was either unloaded or incapable of being fired.” The commentator goes on to state that the defendant may be convicted of second degree robbery or burglary, since section 160.10 (subd 2, par [b]) and section 140.25 (subd 1, par [d]) "requires only display of what appears to be a gun, but does not require that it be loaded or operable.”
There are numerous State and Federal laws regulating artificial food products. The rationale behind many such laws is that the consumer must be protected against a manufacturer fraudulently marketing a food product resembling, but actually inferior to, a genuine food. At a minimum such laws require that the food substitute be clearly labeled "imitation.”
For example, in United States v 651 Cases (114 F Supp 430), the United States District Court held that a food product labeled "Chil-Zert” was an imitation ice cream. Because it was not labeled "imitation,” the court found the product to have been misbranded. The court wrote (p 432-433): "It would seem that imitation is tested not by the presence or absence of any one element of similarity, but rather by the effect of a composite of all such elements. As indicated above, Chil-Zert is identical with ice cream in its method of manufacture, packaging and sale. It is similar in taste, appearance, color, texture, body and melting qualities. It has identical uses; its composition differs only from ice cream in the substitution of a cheaper ingredient; namely, vegetable oil in place of milk products. It is, therefore, something less than the genuine article chocolate ice cream. It is inescapable that the ordinary understanding of English speech would denominate it as an imitation of ice cream.”
*1036 In 62 Cases of Jam v United States (340 US 593, 599), the United States Supreme Court reversed a holding that a fruit preserve labeled "imitation jam” had been misbranded in violation of the Pure Food and Drug Act of 1906 (34 US Stat 768). In the majority opinion, Justice Frankfurter wrote (pp 599, 600): "[I]n § 403 (c) of the Act * * * Congress did not give an esoteric meaning to 'imitation.’ It left it to the understanding of ordinary English speech. And it directed that a product should be deemed 'misbranded’ if it imitated another food 'unless its label bears, in type of uniform size and prominence, the word "imitation” and, immediately thereafter, the name of the food imitated.’ * * * [T]he name 'imitation jam’ at once connotes precisely what the product is: a different, an inferior preserve, not meeting the defined specifications.”
In the instant case, the person for whose benefit the Administrative Code provision was enacted, a person confronted with what appears to be an operable, functioning weapon, was entitled to freedom from fear that his life and safety were imperiled. Indeed, obviously to discourage possible use of the instrument in the commission of a crime, the city council went further and prohibited manufacture, sale or possession of such products, regardless of intent to use them for illegal purposes. Just as the producer of what may be an edible, nutritious food is compelled to differentiate his product from the genuine food which it resembles, a person is required to make certain that the color, the plugged barrel and general appearance of the pistol minimize the possibility of the mistaken belief that the instrument is genuine. The color and other indicia of nongenuineness serve the same purpose as the label "imitation” affixed to a synthetic food.
In summary, this court is of the opinion that the defendant’s possession of the pistol is in violation of the Administrative Code, and he must stand trial on the charge.