## 62 CASES OF JAM ᴇᴛ ᴀʟ. *v.* UNITED STATES.

No. 363. Argued March 5–6, 1951.—Decided March 26, 1951.

*Benjamin F. Stapleton, Jr.* argued the cause for petitioners. With him on the brief were *Clarence L. Ireland* and *Edward Brown Williams.*

*Robert L. Stern* argued the cause for the United States. With him on the brief were *Solicitor General Perlman, Assistant Attorney General McInerney, Vincent A. Kleinfeld, John T. Grigsby* and *William W. Goodrich.*

Mr. Justice Frankfurter delivered the opinion of the Court.

The Federal Food, Drug, and Cosmetic Act authorizes the United States to bring a libel against any article of food which is "misbranded" when using the channels of interstate commerce. Act of June 25, 1938, § 304, 52 Stat. 1040, 1044, 21 U. S. C. § 334. The Act defines "misbranded" in the eleven paragraphs of § 403. 52 Stat. 1047–1048, 21 U. S. C. § 343. The question before us is raised by two apparently conflicting paragraphs.

One of them, subsection (c), comes from the original Pure Food and Drugs Act of 1906. Act of June 30, 1906, 34 Stat. 768, 770–771, § 8 (first paragraph concerning "food," and second proviso). It directs that a food shall be deemed "misbranded" if it "is an imitation of another food, unless its label bears, in type of uniform size and prominence, the word 'imitation' and, immediately thereafter, the name of the food imitated." The other, subsection (g), was added by the enlargement of the statute in 1938. It condemns as "misbranded" a product which "purports to be or is represented as a food," the ingredients of which the Administrator has standardized, if the product does not conform in all respects to the standards prescribed. The Administrator has authority to promulgate standards when in his judgment "such action will promote honesty and fair dealing in the interest of consumers." § 401, 52 Stat. 1046, 21 U. S. C. § 341.

The proceeding before us was commenced in 1949 in the District Court for the District of New Mexico. By it the United States seeks to condemn 62 cases of "Delicious Brand Imitation Jam," manufactured in Colorado and shipped to New Mexico. The Government claims that this product "purports" to be fruit jam, a food for which the Federal Security Administrator has promulgated a "definition and standard of identity." The regulation

specifies that a fruit jam must contain "not less than 45 parts by weight" of the fruit ingredient. 21 C. F. R. (1949 ed.) § 29.0. The product in question is composed of 55% sugar, 25% fruit, 20% pectin, and small amounts of citric acid and soda. These specifications show that pectin, a gelatinized solution consisting largely of water, has been substituted for a substantial proportion of the fruit required. The Government contends that the product is therefore to be deemed "misbranded" under § 403 (g).

On the basis of stipulated testimony the District Judge found that although the product seized did not meet the prescribed standards for fruit jam, it was "wholesome" and "in every way fit for human consumption." It was found to have the appearance and taste of standardized jam, and to be used as a less expensive substitute for the standard product. In some instances, products similar to those seized were sold at retail to the public in response to telephone orders for jams, and were served to patrons of restaurants, ranches and similar establishments, who had no opportunity to learn the quality of what they received. But there is no suggestion of misrepresentation. The judge found that the labels on the seized jars were substantially accurate; and he concluded that since the product purported to be only an imitation fruit preserve and complied in all respects with subsection (c) of § 403 of the Act, it could not be deemed "misbranded." 87 F. Supp. 735.

The Court of Appeals for the Tenth Circuit, one judge dissenting, reversed this judgment. 183 F. 2d 1014. It held that since the product seized closely resembled fruit jam in appearance and taste, and was used as a substitute for the standardized food, it "purported" to be fruit jam, and must be deemed "misbranded" notwithstanding that it was duly labeled an "imitation." The court therefore remanded the cause with instructions to

enter a judgment for condemnation. We granted certiorari, 340 U. S. 890, because of the importance of the question in the administration of the Federal Food, Drug, and Cosmetic Act.

1. By the Act of 1906, 34 Stat. 768, as successively strengthened, Congress exerted its power to keep impure and adulterated foods and drugs out of the channels of commerce. The purposes of this legislation, we have said, "touch phases of the lives and health of people which, in the circumstances of modern industrialism, are largely beyond self-protection. Regard for these purposes should infuse construction of the legislation if it is to be treated as a working instrument of government and not merely as a collection of English words." *United States* v. *Dotterweich,* 320 U. S. 277, 280. This is the attitude with which we should approach the problem of statutory construction now presented. But our problem is to construe what Congress has written. After all, Congress expresses its purpose by words. It is for us to ascertain—neither to add nor to subtract, neither to delete nor to distort.

2. Misbranding was one of the chief evils Congress sought to stop. It was both within the right and the wisdom of Congress not to trust to the colloquial or the dictionary meaning of misbranding, but to write its own. Concededly we are not dealing here with misbranding in its crude manifestations, what would colloquially be deemed a false representation. Compare § 403 (a), (b), (d), 52 Stat. 1047, 21 U. S. C. § 343 (a), (b), (d). Our concern is whether the article of food sold as "Delicious Brand Imitation Jam" is "deemed to be misbranded" according to § 403 (c) and (g) of the Federal Food, Drug, and Cosmetic Act of 1938.

3. The controlling provisions of the Act are as follows:

"Sec. 304. (a) [as amended by the Act of June 24, 1948, 62 Stat. 582] Any article of food, drug, device, or cosmetic that is adulterated or misbranded when

introduced into or while in interstate commerce or while held for sale (whether or not the first sale) after shipment in interstate commerce, . . . shall be liable to be proceeded against while in interstate commerce, or at any time thereafter, on libel of information and condemned in any district court of the United States within the jurisdiction of which the article is found: . . . .

. . . . .

"SEC. 401. Whenever in the judgment of the [Administrator] such action will promote honesty and fair dealing in the interest of consumers, he shall promulgate regulations fixing and establishing for any food, under its common or usual name so far as practicable, a reasonable definition and standard of identity, a reasonable standard of quality, and/or reasonable standards of fill of container: . . . . In prescribing a definition and standard of identity for any food or class of food in which optional ingredients are permitted, the [Administrator] shall, for the purpose of promoting honesty and fair dealing in the interest of consumers, designate the optional ingredients which shall be named on the label. . . .

. . . . .

"SEC. 403. A food shall be deemed to be misbranded—

. . . . .

"(c) If it is an imitation of another food, unless its label bears, in type of uniform size and prominence, the word 'imitation' and, immediately thereafter, the name of the food imitated.

. . . . .

"(g) If it purports to be or is represented as a food for which a definition and standard of identity has been prescribed by regulations as provided by

section 401, unless (1) it conforms to such definition and standard, and (2) its label bears the name of the food specified in the definition and standard, and, insofar as may be required by such regulations, the common names of optional ingredients (other than spices, flavoring, and coloring) present in such food."

4. By §§ 401 and 403 (g), Congress vested in the Administrator the far-reaching power of fixing for any species of food "a reasonable definition and standard of identity." In *Federal Security Administrator* v. *Quaker Oats Co.*, 318 U. S. 218, we held that this means that the Administrator may, by regulation, fix the ingredients of any food, and that thereafter a commodity cannot be introduced into interstate commerce which "purports to be or is represented as" the food which has been thus defined unless it is composed of the required ingredients. The Administrator had prescribed the ingredients of two different species of food—"farina" and "enriched farina." The former was an exclusively milled wheat product; the latter included certain additional ingredients, one of which optionally could be vitamin D. The Quaker Oats Company marketed a product it called "Quaker Farina Wheat Cereal Enriched with Vitamin D," which did not conform to either standard. Because it contained an additional vitamin it was not "farina"; because it lacked certain of the essential ingredients it could not be called "enriched farina." It was concededly a wholesome product, accurately labeled; but under the Administrator's regulations it could not be sold. We sustained the regulations, holding that Congress had constitutionally empowered the Administrator to define a food and had thereby precluded manufacturers—or courts—from determining for themselves whether some other ingredients would not produce as nutritious a product. "The statutory purpose to fix a definition of iden-

tity of an article of food sold under its common or usual name would be defeated if producers were free to add ingredients, however wholesome, which are not within the definition." 318 U. S. at 232.

5. Our decision in the *Quaker Oats* case does not touch the problem now before us. In that case it was conceded that although the Quaker product did not have the standard ingredients, it "purported" to be a standardized food. We did not there consider the legality of marketing properly labeled "imitation farina." That would be the comparable question to the one now here.

According to the Federal Food, Drug, and Cosmetic Act, nothing can be legally "jam" after the Administrator promulgated his regulation in 1940, 5 Fed. Reg. 3554, 21 C. F. R. § 29.0, unless it contains the specified ingredients in prescribed proportion. Hence the product in controversy is not "jam." It cannot lawfully be labeled "jam" and introduced into interstate commerce, for to do so would "represent" as a standardized food a product which does not meet prescribed specifications.

But the product with which we are concerned is sold as "imitation jam." Imitation foods are dealt with in § 403 (c) of the Act. In that section Congress did not give an esoteric meaning to "imitation." It left it to the understanding of ordinary English speech. And it directed that a product should be deemed "misbranded" if it imitated another food "unless its label bears, in type of uniform size and prominence, the word 'imitation' and, immediately thereafter, the name of the food imitated."

In ordinary speech there can be no doubt that the product which the United States here seeks to condemn is an "imitation" jam. It looks and tastes like jam; it is unequivocally labeled "imitation jam." The Government does not argue that its label in any way falls short of the requirements of § 403 (c). Its distribution in interstate commerce would therefore clearly seem to be

authorized by that section. We could hold it to be "misbranded" only if we held that a practice Congress authorized by § 403 (c) Congress impliedly prohibited by § 403 (g).

We see no justification so to distort the ordinary meaning of the statute. Nothing in the text or history of the legislation points to such a reading of what Congress wrote. In § 403 (g) Congress used the words "purport" and "represent"—terms suggesting the idea of counterfeit. But the name "imitation jam" at once connotes precisely what the product is: a different, an inferior preserve, not meeting the defined specifications. Section 403 (g) was designed to protect the public from inferior foods resembling standard products but marketed under distinctive names. See S. Rep. No. 361, 74th Cong., 1st Sess. 8–11. Congress may well have supposed that similar confusion would not result from the marketing of a product candidly and flagrantly labeled as an "imitation" food. A product so labeled is described with precise accuracy. It neither conveys any ambiguity nor emanates any untrue innuendo, as was the case with the "Bred Spred" considered by Congress in its deliberation on § 403 (g). See H. R. Rep. No. 2139, 75th Cong., 3d Sess. 5; House Hearings on H. R. 6906, 8805, 8941 and S. 5, 74th Cong., 1st Sess. 46–47. It purports and is represented to be only what it is—an imitation. It does not purport nor represent to be what it is not—the Administrator's genuine "jam."

In our anxiety to effectuate the congressional purpose of protecting the public, we must take care not to extend the scope of the statute beyond the point where Congress indicated it would stop. The Government would have us hold that when the Administrator standardizes the ingredients of a food, no imitation of that food can be marketed which contains an ingredient of the original and serves a similar purpose. If Congress wishes to say that

nothing shall be marketed in likeness to a food as defined by the Administrator, though it is accurately labeled, entirely wholesome, and perhaps more within the reach of the meager purse, our decisions indicate that Congress may well do so. But Congress has not said so. It indicated the contrary. Indeed, the Administrator's contemporaneous construction concededly is contrary to what he now contends. We must assume his present misconception results from a misreading of what was written in the *Quaker Oats* case.

*Reversed.*

Mr. Justice Douglas, with whom Mr. Justice Black concurs, dissenting.

The result reached by the Court may be sound by legislative standards. But the legal standards which govern us make the process of reaching that result tortuous to say the least. We must say that petitioner's "jam" purports to be "jam" when we read § 403 (g) and purports to be not "jam" but another food when we read § 403 (c). Yet if petitioner's product did not purport to be "jam" petitioner would have no claim to press and the Government no objection to raise.