# United States Court of Appeals
## For the Eighth Circuit

_____

No. 12-3765

_____

Argus Leader Media, doing business as Argus Leader

*Plaintiff - Appellant*

v.

United States Department of Agriculture

*Defendant - Appellee*

_____

Appeal from United States District Court
for the District of South Dakota - Sioux Falls

_____

Submitted: October 23, 2013
Filed: January 28, 2014

_____

Before RILEY, Chief Judge, COLLOTON and KELLY, Circuit Judges.

_____

RILEY, Chief Judge.

Formerly known as the Food Stamp Program, the Supplemental Nutrition Assistance Program (SNAP or program) is one of America's largest and fastest-growing welfare arrangements: between 2007 and 2011, spending "more than

doubled . . . from about $30 billion to $72 billion."[1]  Amid increasing public scrutiny of this burgeoning program, a Sioux Falls, South Dakota, newspaper called the *Argus Leader* (Argus) wondered how much money individual retailers received from taxpayers each year through the program.  Invoking the federal law meant to bring disclosure sunlight to the government bureaucracy, Argus requested this spending information from the U.S. Department of Agriculture (department or USDA) under the Freedom of Information Act (FOIA), 5 U.S.C. § 552.  Cf. Louis D. Brandeis, Other People's Money 92 (1914) ("Sunlight is said to be the best of disinfectants.").  With little explanation, the department refused disclosure.

After an internal administrative appeal proved fruitless, Argus brought a FOIA suit in the District of South Dakota.  The department moved for summary judgment, contending the information was exempt from disclosure under 5 U.S.C. § 552(b)(3)—known as FOIA Exemption 3—and 7 U.S.C. § 2018(c).  Looking to legislative history and accepting the department's statutory interpretation, the district court found the spending information exempt from disclosure and granted the department's motion. Argus appeals. Concluding the statutory text plainly precludes the department from shielding the spending information under Exemption 3, we reverse.

## I.    BACKGROUND

The Food Stamp Act of 1964, Pub. L. No. 88–525, 78 Stat. 703, launched the program with a $75 million appropriation in its first year, rising to $200 million in its third.  See id. § 16(a), 78 Stat. at 709.  In fiscal year 2012, the program's total cost exceeded $78 billion, with more than 46 million people—over fifteen percent of the

---

[1]Congr. Budget Office, The Supplemental Nutrition Assistance Program 5 (2012), available at http://www.cbo.gov/sites/default/files/ cbofiles/attachments/04-19-SNAP.pdf.

U.S. population—receiving benefits.[2]  Most benefits go to needy families: 76 percent of SNAP households include "a child, an elderly person, or a disabled person" and "these households received 83 percent of all benefits."[3]  An estimated $858 million per year is "trafficked," meaning "SNAP recipients sell their benefits for cash at a discount to food retailers," and approximately ten percent of participating retailers engage in trafficking.[4]

### A.  Administrative Proceedings

On February 1, 2011, Argus sent a letter to the department requesting "yearly redemption amounts, or EBT sales figures, for each store" participating in the program between fiscal years 2005 and 2010.  Beneficiaries receive an electronic benefit transfer (EBT) card, which functions like a debit card.  To use the card at a participating retailer, beneficiaries swipe their EBT card and enter a four-digit personal identification number at checkout.  As with any other debit card transaction, a third-party processor deducts the transaction amount from the beneficiary's account and credits it to the retailer's account.  Such third-party processors "handle and track [program] benefit accounts," then send transaction data to the department.  Although the days when retailers had to redeem physical food stamps have long passed, the department still refers to this electronic process as a "redemption."  After receiving

---

[2]See Food & Nutrition Service (FNS), SNAP Monthly Data (Nov. 8, 2013), http://www.fns.usda.gov/pd/34SNAPmonthly.htm; FNS, SNAP Annual Summary (Nov. 8, 2013), http://www.fns.usda.gov/pd/SNAPsummary.htm; see also Phil Izzo, Food-Stamp Use Rises; Some 15% Get Benefits, Wall St. J., Aug. 9, 2013, http://blogs.wsj.com/economics/2013/08/09/food-stamp-use-rises-some-15- of-u-s-gets-benefits.

[3]FNS, USDA, Characteristics of SNAP Households: Fiscal Year 2011, at xv (2012), available at http://www.fns.usda.gov/sites/default/files/ 2011Characteristics.pdf.

[4]USDA, The Extent of Trafficking in the SNAP: 2009-2011, at ii (2013), available at http://www.fns.usda.gov/sites/default/files/Trafficking2009.pdf.

transaction data from the third-party processors, the department loads each retailer's aggregated data into a government database.

The department appears to concede that it could use this database to supply the information requested by Argus. The department simply refuses to do so. In an undated letter received February 17, 2011, the department revealed the names and addresses of all participating retailers, but withheld "all other information . . . under 5 U.S.C. [§] 552(b)(3) and (b)(4)." In a letter dated February 25, 2011, Argus appealed this withholding. The department denied the appeal in another undated letter.

## B.     Article III Proceedings

On August 26, 2011, Argus filed a complaint under 5 U.S.C. § 552(a)(4)(B) in federal court seeking to compel the department to provide the withheld information. The department moved for summary judgment, invoking Exemption 3, 5 U.S.C. § 552(b)(3).

On September 27, 2012, the district court granted the department's motion. First, the district court decided 7 U.S.C. § 2018 qualified as a withholding statute under Exemption 3. Second, the district court found the retailer spending information was exempt from disclosure because it was "the type of information that *can be obtained under the authority of § 2018*"—though, in practice, it is not obtained from the individual retailers. (Emphasis added). Consulting legislative history, the district court thought a 1994 amendment to § 2018 "demonstrate[d] that all types of information that relate to tax, income, or redemption data that is [sic] correlated with participation in [the program] is to be withheld in all instances except internal administrative purposes or for law enforcement's use." The district court determined the department was entitled to withhold the data. Argus appeals, invoking our jurisdiction under 28 U.S.C. § 1291.

## II.    DISCUSSION

We "perform[] a *de novo* review of the grant of summary judgment in a FOIA case." Mo. ex rel. Garstang v. U.S. Dep't of Interior, 297 F.3d 745, 749 (8th Cir. 2002). A government agency is not entitled to summary judgment in a FOIA case unless "the agency proves that it has fully discharged its obligations under FOIA, after the underlying facts and the inferences to be drawn from them are construed in the light most favorable to the FOIA requester." Miller v. U.S. Dep't of State, 779 F.2d 1378, 1382 (8th Cir. 1985). "In order to discharge this burden, the agency 'must prove that each document that falls within the class requested either has been produced, is unidentifiable, or is *wholly exempt* from the Act's inspection requirements.'" Id. at 1382-83 (emphasis added) (quoting Nat'l Cable Television Ass'n, Inc. v. FCC, 479 F.2d 183, 186 (D.C. Cir. 1973)).

### A.    Statutory Text

"Our analysis begins, as always, with the statutory text." United States v. Gonzales, 520 U.S. 1, 4 (1997). The relevant text of FOIA Exemption 3 allows agencies to withhold information that is

> *specifically exempted* from disclosure by statute (other than [5 U.S.C. § 552b]), if that statute—
>
> (A)(i) *requires* that the matters be withheld from the public in such a manner as to leave no discretion on the issue; or
>
> (ii) *establishes* particular criteria for withholding or *refers* to particular types of matters to be withheld[.[5]]

5 U.S.C. § 552(b)(3) (emphasis added). The department contends the spending information is "specifically exempted" by 7 U.S.C. § 2018(c). Argus does not dispute

---

[5]There is one additional requirement not applicable to this case.

that § 2018(c) is a withholding statute (i.e., one that "requires," "establishes," or "refers" to non-discretionary or particular withholding of information).

Instead, Argus challenges the district court's conclusion that program spending information falls within the withholding contemplated by § 2018(c). Again, we look to the relevant statutory text:

> (c) Information *submitted by applicants*; safeguards; disclosure to and use by State agencies
>
> Regulations issued pursuant to this chapter shall require *an applicant retail food store or wholesale food concern to submit information*, which may include relevant income and sales tax filing documents, which will permit a determination to be made as to *whether such applicant qualifies, or continues to qualify*, for approval . . . . Regulations issued pursuant to this chapter shall provide for safeguards which limit the use or disclosure of *information obtained under the authority granted by this subsection* . . . . Any person who publishes, divulges, discloses, or makes known in any manner or to any extent not authorized by Federal law (including a regulation) any *information obtained under this subsection* shall be fined not more than $1,000 or imprisoned not more than 1 year, or both.

7 U.S.C. § 2018(c) (emphasis added).

Because the retailer spending information is not "submit[ted]" by "an applicant retail food store or wholesale food concern," id., the information is not exempt from disclosure. The department, not any retailer, generates the information, and the underlying data is "obtained" from third-party payment processors, not from individual retailers. See, e.g., Brian A. Garner's Modern American Usage 74 (3d ed. 2009) (defining "obtain" as "to get, acquire"); Webster's Third New Int'l Dictionary 1559 (1993) (defining "obtain" as "to gain or attain possession or disposal of"). Neither of the forms used to determine whether a given retailer "qualifies" or

"continues to qualify" as a program participant asks for the spending information. These plain textual reasons for rejecting the department's position mean we need not rely on the Supreme Court's admonition that FOIA exemptions "must be 'narrowly construed,'" Milner v. Dep't of Navy, 562 U.S. ___, ___, 131 S. Ct. 1259, 1262 (2011) (quoting FBI v. Abramson, 456 U.S. 615, 630 (1982)), to conclude retailer spending information is not "obtained under the authority granted by" § 2018(c).

Our plain reading is further confirmed by the subsection heading, which refers to "Information *submitted by applicants*." 7 U.S.C. § 2018(c) (emphasis added). A subsection "heading cannot substitute for the operative text of the statute." Fla. Dep't of Revenue v. Piccadilly Cafeterias, Inc., 554 U.S. 33, 47 (2008). But "statutory titles and section headings 'are tools available for the resolution of a doubt about the meaning of a statute.'" Id. (quoting Porter v. Nussle, 534 U.S. 516, 528 (2002)). Even if the statutory text left any ambiguity, the heading would resolve that doubt in favor of disclosure.

The district court's contrary conclusion stemmed from a misreading of the statute. First, the district court singled out the term "any information," interpreting the statute to require withholding of all information—regardless of its source—used to determine whether "a retailer qualifies or continues to qualify for participation in the [program]." Yet the statute makes clear that only information obtained under § 2018(c)—submitted by a retailer—is exempted. When the statute says "obtained" it means "obtained," not "*can be* obtained," as the district court reasoned. (Emphasis added). "Congress expresses its purpose by words. It is for [courts] to ascertain—neither to add nor to subtract, neither to delete nor to distort." 62 Cases, More or Less, Each Containing Six Jars of Jam v. United States, 340 U.S. 593, 596 (1951). Here, however else the spending information could be obtained, the department actually obtained it from third-party payment processors, not the retailers themselves.

Second, the district court thought the spending information qualified as "relevant income and sales tax filing documents." The district court opined, "Although Congress has not expressly deemed redemption information as essential data to be included under § 2018, the statutory language encompasses this type of income and tax information because redemption data naturally falls under either term's broad umbrella." Again, the district court departed from the plain text of the statute, which refers to "income and sales tax *filing documents*." 7 U.S.C. § 2018(c) (emphasis added). These words—confirmed by the requirement to "provide written authorization for the Secretary to verify all relevant tax *filings* with *appropriate agencies*"—plainly refer to tax documents filed with relevant state, local, and federal tax authorities. Id. (emphasis added). Echoing the Supreme Court, we "have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there. When the words of a statute are unambiguous, then, this first canon is also the last: judicial inquiry is complete." Barnhart v. Sigmon Coal Co., 534 U.S. 438, 461-62 (2002) (internal quotation omitted); see, e.g., Owner-Operator Indep. Drivers Ass'n, Inc. v. Supervalu, Inc., 651 F.3d 857, 862 (8th Cir. 2011). The spending information is not a tax filing document, so the district court's "broad umbrella" cannot shade the spending information from the sunlight.

### B. Statutory History

Although "the authoritative statement is the statutory text, not the legislative history," Exxon Mobil Corp. v. Allapattah Servs., Inc., 545 U.S. 546, 568 (2005), we recognize that the district court relied in part on the legislative history. While resolving this case purely on textual grounds, we observe "for those who find legislative history useful," United States v. Tinklenberg, 563 U.S. ___, ___, 131 S. Ct. 2007, 2015 (2011), that this history is more fairly read to support Argus' position.

First, Congress has clearly indicated its intent to involve the public in counteracting fraud perpetrated by retailers participating in the program. See, e.g.,

Food Stamp and Commodity Distribution Amendments of 1981, Pub. L. No. 97–98, § 1314, 95 Stat. 1213, 1285 (codified as amended at 7 U.S.C. § 2018(e)).

Second, the statutory history reveals that redemptions were historically governed not by § 2018(c), but by an entirely different section: 7 U.S.C. § 2019. See Food Stamp Act of 1977, Pub. L. No. 95–113, sec. 1301, § 10, 91 Stat. 913, 969 (codified as amended at 7 U.S.C. § 2019). Thus, Congress apparently never expected the department to obtain redemption data, used to generate the requested spending information, "under the authority granted by [§ 2018(c)]." 7 U.S.C. § 2018(c).

Noting the history of § 2018(c) but relying on its plain text, we conclude Exemption 3 cannot prevent Argus from "pierc[ing] the veil of administrative secrecy and . . . open[ing] [the department's] action[s] to the light of public scrutiny." Dep't of Air Force v. Rose, 425 U.S. 352, 361 (1976) (internal quotation omitted).

## III. CONCLUSION
We reverse and remand for further proceedings consistent with this opinion.

—————————————————